Van Brunt, J.
There necessarily arise some very interesting questions in the decision of this case, and we must of course determine the facts before we consider the law applicable to those facts.
It has been claimed, upon the part of the counsel for the plaintiff, that extraordinary presumptions must guide us in determining the facts of the case, because *141 a question of legitimacy is involved. I have been unable to appreciate this suggestion, because, perhaps unfortunately, there has not been a sufficient quantity of sentiment engrafted in my nature to permit me to comprehend how it is possible that children who live but a few months after their birth can have any earthly interest in any decision which our tribunals may make in regard to their status ; and it is very certain that no determination that this court can make, will in any manner affect their status in the world which they now inhabit.
When we conssider the parties to this action, I think there can be no hesitation in saying that the plaintiff is more entitled to the sympathy of the court than is the defendant. There is no doubt in my mind, from the facts developed upon this trial, that at the time she contracted the marriage with the defendant, she supposed that she had a legal right so to do, and that she did it innocently. It further appears that she communicated to the defendant, prior to the marriage to him, all the facts relating to the marriage in the Indian Territory, and that he married the plaintiff with full knowledge of those events.
Under these circumstances it must be conceded that the plaintiff is entitled to the sympathy of the court, and that she ought, if she can be permitted so to do without overriding any well-established principles of law, or well established fact, to be allowed to assert her rights against the defendant as his wife.
The only question of fact is the determination of the character of the ceremony which took place in the Indian Territory in the forepart of October, 1869, between the plaintiff, and J. M. Taylor, and at which the Indian preacher officiated, and which was performed in the presence of “Pomp,” the plaintiff’s sister. In determining that question, we must necessarily exclude from all consideration the certificate of marriage, be *142 cause it is contradicted "by facts which I consider well established by the evidence, and because it is not legal evidence for any purpose, for reasons which I will call attention to hereafter.
Before considering the evidence as to what did take place in the Indian Territory, we must consider the relation of the parties to each other, and the circumstances attending that unfortunate visit. It appears that the plaintiff was a widow, having been married to a man by the name of Vance, who was then dead ; that her sister, “Pomp,” was married to a Colonel Taylor, and that Colonel Taylor had a son by a previous wife, named J. M. Taylor, and that he resided with his family at Bonham, Texas. It further appears that the plaintiff’s sister was exceedingly desirous that the plaintiff should marry J. M. Taylor, and that the plaintiff had promised so to do within two years, but that the sister was not content with that promise, and desired that some ceremony should be performed between the plaintiff and Taylor, so that there would be no doubt as to her being Taylor’s wife after her sister’s death. That such a ceremony was not performed between the parties in Texas, because it could not be kept a secret, which seems to have been considered necessary.
On or about October 11, 1869, the plaintiff and her sister leave Bonham, for the ostensible purpose of going to the river, some sixteen miles distant, to pick plums, and by a strange coincidence they meet, at the river, J. M. Taylor, who had gone from Bonham to the river by another route. Without waiting to pick any plums, Taylor and the two sisters at once cross the river, and continue their journey in the Indian Territory, until they arrive at a log cabin inhabited by a man who preached to the Indians.
Upon their arrival the preacher was absent, and the party waited until his return ; whereupon a ceremony *143 was performed between the plaintiff and J. M. Taylor, which the plaintiff calls a marriage ceremony. The positive evidence as to what did take place upon this occasion, is of the most meagre and indistinct character.
The plaintiff, the only witness who testified upon the subject, is entirely unable to give us any of the details, except that the preacher said he was not an ordained preacher. She says, however, that she did not intend it to be a marriage, and that she did not consider it binding, because, as she stated upon this trial, and has stated upon former occasions, they gave false names. She says, further, that she supposed that it was only a more solemn reiteration of the promise she had previously given to her sister. Upon being asked whether this preacher did pronounce them to be man and wife, her reply was, “ I cannot take oath to that,” and upon being asked if she can swear that he did not so pronounce them, her reply was, “I can not take oath to that.”
After this ceremony had been performed, the party returned to Bonham, Texas, and the plaintiff left for San Antonio the next morning. The plaintiff and Taylor never cohabited together as man and wife.
The plaintiff, notwithstanding her belief, and her knowledge, if her testimony is correct, that she was not the wife of J. M. Taylor, thought it necessary to apply to the authorities in the Indian Territory for a divorce from Taylor.
It is apparent, from the circumstances surrounding this case, that the parties went to this preacher’s cabin for the purpose of carrying out the wish of the plaintiff’s sister, that she, the plaintiff, should be young Taylor’s wife, and that the ceremony could not be performed in Texas because it could not be kept a secret, which seemed to be considered necessary.
Pomp seems to be determined to have this thing *144 fixed in her lifetime, so that there could be no mistake about it after her death, and this expedition into the Indian Territory was planned to carry this determination into effect. At the time of her subsequent marriage to the defendant, the plaintiff undoubtedly supposed that the marriage with Taylor was void because false names had been given; and in this belief she is not alone, because it is shared by many people. In fact, I recollect that one of the English novelists has made the plot of his novel turn upon the fact that a marriage was void because the husband was married under an assumed name.
The fact that the plaintiff always speaks of this ceremony as a “ marriage ceremony; ” that she thought it necessary to get a divorce ; that she always claimed the marriage was void because false names had been given, and the circumstances which surrounded the parties at the time the ceremony was performed, seem to me to lead irresistibly to the conclusion that a ceremony of marriage per verba de presenti, and not per verba de futuro, as is now claimed by the plaintiff, was performed by that preacher between the plaintiff and J. M. Taylor.
It is true that the plaintiff testified upon this trial that she did not intend it should be considered a marriage ceremony, and that she did not intend to be bound by it; but certainly this condition of her mind is totally at variance to all the facts of the case. It is true also that she was asked at the trial as to what were the intentions of Taylor, and that that question was excluded, because it was improper to ask it in that form, as she was not shown to be competent to testify as to what was in Taylor’s mind at tins time.
In coming to the conclusion which I have, I have given due weight to the presumption that no marriage took place in the Indian Territory, because of the subsequent marriage between the plaintiff and the defend *145 ant; but I do not consider it proper for a judge, in order to give effect to a presumption, to override the necessary conclusions which must be derived from established facts. I know that presumptions have been carried to so great a length, both in this country and in Great Britain, as to render the law not only uncertain,, but ridiculous.
Presumptions have been allowed to overrule both reason and common sense, because the exigencies of some particularly hard case seem to require it. There' is a case reported in England which fitly illustrates this proposition.
A man was on trial for poaching. It was claimed upon the part of the prosecution that he had shot and killed a pheasant, contrary to law, and thereby made-himself amenable to a fine.
The evidence was that he was seen with a gun in his. hands, and that a pheasant rose before him; that he; raised his gun, and fired in the direction of the pheasant, which immediately fell dead. The jury found a. verdict for the defendant. Prosecution appealed.. Upon the decision of the appeal the court say that: under the doctine of presumption the verdict may be-sustained, because, there being no evidence of any wound upon the bird, the jury may have presumed that: the bird was killed, not by any shot from the defendant’s gun, but was frightened to death at the noise of the explosion, when the gun was fired.. Ridiculous as; such a case seems to be, equally violent presumptions, have been indulged in by our courts in order to enable; them to reach some desired conclusion.
It is with regret that I have come to the conclusion; which I have stated upon the facts of this case; but hard as it may be to the plaintiff, having come to this, conclusion it is my duty to decide accordingly.
Having determined, as a matter of fact, that the-plaintiff and Taylor, upon the occasion of this,visit to; *146 the Indian Territory, entered into a contract of marriage, per verba de presentí, and that snch contract was never followed by cohabitation, we must- next determine the law which is to govern us in the construction of that contract. The United States supreme court has decided that the Indian nations are not foreign states, neither is the territory which they inhabit foreign territory ; that the land which they inhabit is not part of any of the Territories of the United States ; neither are they States of the Union, and the best definition which that court has been able to give of the relation between those nations and the United States .government is, that they are the wards of the government ; admitting however, that the guardian was entirely, powerless to-compel either States or individuals to fulfill their contracts with these wards of the United States government.
The powers of legislation which the Indian nations exercise, are derived from the treaties which have been made between them and the United States government. In the treaty of June 22, 1855, made by the United •States and the Choctaw and Chickasaw Indians (the marriage in question having taken place within the limits of the Chickasaw nation), the unrestricted right •of self-government, and full jurisdiction over persons •and property, within their respective limits, was given to these Indian tribes. All persons, however, with their property, who were not by birth, adoption or ■otherwise, citizens or members of either the Choctaw •or Chickasaw tribes were especially excluded from such jurisdiction. It is clear, therefore, that the legislation of the Indian Territory did not apply to the plaintiff •and Taylor, they being whites and residents of Texas ; and it is for this reason that the certificate of this marriage must as a matter of law be excluded as evidence.
• Having thus determined that the lex loci is not to guide us in consideration of this contract, what law is *147 to govern ns ? In the consideration of this question I think that I may safely say, although I have found no authority to sustain the proposition, that there is no place upon the globe into which two persons can go and make a contract, but that there is some law which will govern the construction' of that contract.* The common law cannot be held to apply to the contract now under discussion, because it has obtained only in such portions of .the earth as have been colonized by the subjects of Great Britain. The civil law cannot be held to apply, “ as the lex loci ” because the civil law applies only to the Latin race. The canon law cannot be held to apply, because it now obtains nowhere either Europe or America,† that I am aware of. It would seem, therefore, that there is no lex loci applicable. Under these circumstances, what law is to govern us ?
It seems to me that the lex domicilii naturally suggests itself as the only law applicable to this contract, since both of the parties were residents of the same State. What then is the law of Texas relating to contracts such as this ? In the absence of all proof, the law of Texas must be presumed to be either the law of this State, or the common law, or the civil law.
In the State of Texas, the common law cannot be presumed to prevail, because she is not one of the States which has taken the common law from England. If we were to follow the rule laid down in the case of Savage v. O’Neil (44 N. Y. 298), it would be held that the law of Texas is presumed to be the same as that of New York; but I think that it would be hazardous to follow the rule laid down in that case, in view of the *148 plain intimation given by the court of appeals, in the case of McCulloch v. Norwood (58 N. Y. 567), that they will not hold that the law of the State of New York is to be presumed to obtain in any other State.
In the opinion of the learned judge who was the mouth-piece of the court in that case occurs the following language: “It seems to me to be conceded upon the part of the appellant, that there being no proof of the law of Ohio on the subject, it is to be presumed that the law of Ohio is the same as our own. That such a presumption exists in respect to statute law is a proposition by no means so clear as appears to be supposed. Expressions are contained in some of the opinions which have been cited, favoring the proposition that the presumption exists with reference to purely statutory regulations, but there is no authoritative decision to that effect. It is difficult to find any reason upon which such a rule can rest, and when the question is distinctly presented, we regard it as still open to examination.”
It seems, therefore, that we must determine the legality of the contract in question according to the civil law.
It is claimed by the counsel for the plaintiff, that this contract, even if entered into per verba de presentí, was not a valid contract, because it was not celebrated before an ordained minister or a magistrate. I have been unable to find any distinction between the rules of the common and civil law governing contracts of this description. I know that it is laid down in many textbooks that a contract of marriage per verba de futuro, followed by cohabitation, is a good marriage; but it certainly is not under the law of the State of New York, neither do I think that it can be so held under either the civil or common law. Under the canon law, such a marriage was held to be good; because they say it is a contract partially fulfilled, and equity will compel its *149 completion. Therefore, if I had found as a matter of fact that this contract of marriage between the plaintiff and Taylor had been entered into per verba de futuro, no marriage would have been established. In the State of Louisiana, a State where the civil law obtains, it has been expressly held that it is not essential to a valid marriage that either a minister or a magistrate should intervene, that State having derived its common law from Spain, the Council of Trent never having been deemed binding upon the colony.
The same principle has been decided by our courts in the case of Caujolle v. Ferrié (28 N. Y. 90), in which case it was held “that a marriage celebrated in France per verba de presentí was a valid marriage.”
My attention has also been called to the fact that no cohabitation has been proved in this case, and that no authority can be found in this State holding a marriage valid, unless there has been cohabitation or the intervention of a minister or magistrate. Although this is undoubtedly true, these can never be held necessary to establish a valid contract of marriage unless the courts in respect to such contracts reverse all the rules of evidence applicable to other civil contracts. Broom, in his Legal Maxims, has very ably discussed this question, and shows that the maxim nuptias non concubitus sed consensus facit is well established by authority. This being the rule of the civil as well as of the common law, the marriage between the plaintiff and Taylor was a valid marriage; and the said Taylor being alive, the subsequent marriage between the plaintiff and defendant was void.
My attention has been called to the fact that Congress has thought it necessary to pass an act to legalize marriages entered into between American citizens abroad, but this has no bearing' upon the question under discussion, because this legislation arose from the doubt as to the legality of marriages which were *150 accustomed to be entered into at the foreign consulates and legations of the United States, between citizens of the United States, the lex loci not having been in any respect complied with.
The complaint of the plaintiff must therefore be dismissed.
See De Thoren v. Att. Gen., L. R. 1 App. Cas. H. L., Div., 686.

 The principle is sometimes invoked that as against a party who cannot prove as a fact the existence of a foreign law, the court may apply the law of the forum.

 Except in a qualified sense in some continental states, where it is resorted to in the absence of authority under the municipal law.